## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

THE OKLAHOMA OBSERVER, ET AL., )
            )
     Plaintiffs,   )
vs.           )   NO.  CIV-14-0905-HE
            )
ROBERT PATTON, ET AL.,   )
            )
     Defendants.  )

## ORDER

Plaintiffs are media organizations and journalists who investigate and report on, among other things, execution proceedings and the lethal injection process.  They assert claims based on the First Amendment and a similar provision of the Oklahoma Constitution, challenging limitations on their ability to witness executions in Oklahoma.  The claims arise against the backdrop of the execution of Clayton Lockett on April 29, 2014, which involved various problems.  In the wake of that execution, the State of Oklahoma, through its Department of Corrections (the "DOC"), adopted a new execution protocol, which included various changes in the ability of media representatives to view executions, and continued certain limitations to which plaintiffs also object.  In this case, plaintiffs seek declaratory and injunctive relief  broadly seeking a determination that they have the right, if selected as media representatives,[1] to view and hear the entire execution process from beginning to end,

---

[1]*The DOC employs a "pool" system where a limited number of media representatives who wish to view an execution are selected by lottery and who then have an obligation to brief, or answer questions from, other media representatives who were not selected.  Plaintiffs do not challenge that arrangement, though they do object to the reduction of the number of media witnesses allowed.*

which they describe as the time from when the inmate to be executed enters the execution chamber until he leaves the chamber, dead or alive.

Presently before the court are two motions.  Plaintiffs have moved for entry of a preliminary injunction embracing most or all of the relief they seek in the case, noting that the next execution is currently scheduled for January 15, 2015.  Defendants, the director of the DOC and the warden of the Oklahoma State Penitentiary, where executions are carried out, have filed a motion to dismiss on the basis of Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiffs fail to state a First Amendment claim.[2]  The court held a hearing on the motions on December 4, 2014.  For the reasons which follow, the court concludes plaintiffs' motion for preliminary injunction should be denied and defendants' motion to dismiss granted.

<u>Factual Background</u>

It is unnecessary to the disposition of the present motions to resolve any factual issues that may exist as to the specific circumstances of, or problems with, the execution of Clayton Lockett, as plaintiffs seek prospective relief involving procedures to be used in future executions.  However, as the Lockett execution is at least illustrative of recent media access in Oklahoma, as well as of the types of problems to which media and public attention might be given, it is relied on heavily by plaintiffs and is pertinent to these motions.

It appears from the parties' submissions that DOC personnel encountered problems

---

[2]*Though the motion seeks dismissal of plaintiff's amended complaint in its entirety, neither it nor the related briefing addresses plaintiffs' claim based on the Oklahoma Constitution.*

in inserting intravenous ("IV") lines in Mr. Lockett and that their efforts to insert the IV lines occurred out of sight of the media and other witnesses.[3] By the time the viewing shade to the execution chamber was raised, permitting visual access by the media and other witnesses, Mr. Lockett was on the gurney inside the chamber with the IV lines in place. After administration of the intravenous drugs began, Mr. Lockett started moving, apparently groaning or writhing, and appeared to speak or attempt to speak. He was examined at some point by the physician in attendance. Apparently based on the doctor's assessment of the circumstances and at the direction of the warden, the shade was lowered.[4] Some time later, Mr. Lockett died but was, at that point, outside the view of the witnesses.

Following the Lockett execution, the DOC adopted new procedures to govern executions. The new protocol [Doc. #24-5] changes (or in some cases confirms) various aspects of the process to which plaintiffs object. It confirms that IV lines will be inserted prior to witness viewing.[5] It provides that the audio feed to the witnesses will be turned off after the defendant has made his final statement. It authorizes the director to, among other things, close the curtains or otherwise remove the witnesses if the inmate being executed is not unconscious within five minutes of administration of the drug designed to render him so.

---

[3]One of the plaintiffs, Ms. Fretland, was selected as a media representative and watched those portions of the process open to witnesses. [Doc. #25, p.1].

[4]There is also evidence indicating that the governor was called at some point during the process. However, as noted above, it is unnecessary to the present motions to determine the details of Mr. Lockett's execution.

[5]This appears to be consistent with the written protocol previously in place, though it is stated less explicitly there. See [Doc. #24-6, p. 15].

It reduces the number of media witnesses from twelve to five.  It also makes explicit the DOC director's authority to deviate from the prescribed procedures.

<u>Standing and Sovereign Immunity</u>

Defendants have moved to dismiss certain of plaintiffs' claims, or at least some of the grounds asserted for them, on the basis that plaintiffs lack standing to pursue the particular claim or theory and on the basis that the claims are barred by the doctrine of sovereign immunity.[6]  As these issues are potentially jurisdictional, they are addressed first.

Defendants argue that plaintiffs lack standing to pursue an injunction as to any future closing of the curtains because they cannot demonstrate injury in fact.  They argue that the closing of the curtain was a one-time event not likely to recur, and is hence insufficient as a basis for injunctive relief.  *See* <u>Buchwald v. Univ. of New Mexico Sch. of Med.</u>, 159 F.3d 487, 493 (10th Cir. 1998) (concluding that prior denial of admission to a university sufficed to establish standing for backward-looking monetary damages, but not forward-looking injunctive relief).  To warrant such relief, plaintiffs must demonstrate that they are either "suffering a continuing injury" or "under a real and immediate threat of being injured in the future." <u>Tandy v. City of Witchita</u>, 380 F.3d 1277, 1283 (10th Cir. 2004).  Though mere desire to someday engage in conduct that would subject plaintiffs to harm is not sufficient to establish injury in fact, "a concrete present plan" to engage in such conduct is sufficient.

---

[6]*As defendants' "standing" objections go only to certain theories of recovery asserted by plaintiffs, but not others, it is unclear whether the objections are really to "standing" in a strict sense, or whether they are just objections to the substantive basis for plaintiffs' claims.  As the court concludes the objections lack merit in any event, it is unnecessary to resolve the question.*

*See* Colorado Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1211 (10th Cir. 2014).

The court concludes plaintiffs' allegations are sufficiently definite and non-speculative to establish standing. Plaintiffs have submitted two affidavits stating an intent to participate in the next execution. Plaintiff Fretland, a freelance journalist, states her intent to attend the next execution, enter the media lottery, and report for the other plaintiffs based on her agreement with them. [Doc. # 25, p. 10]. Plaintiff Hamilton, owner and editor of plaintiff The Oklahoma Observer, confirms Ms. Fretland's statement, adding that, even "[i]f she is not selected to enter the witness room, she will stay on the prison grounds and ask questions of the pool observers in order to develop an objective, firsthand account of the proceeding." [Doc. # 19, p. 7]. The next execution is currently scheduled for January 15, 2015, [Doc. # 34-1], and will be governed by the new DOC policies, which permits a discretionary lowering of the blinds. The presence of a formal policy or plan, coupled with the plaintiffs' stated intentions, make out a circumstance at least as concrete and definite as those involved in other cases where the Tenth Circuit has found the injury-in-fact element to be satisfied. *See e.g.,* Colorado Cross Disability Coal, 765 F.3d at 1211 (concluding that an intent to visit a local shopping mall "six times per year" and return to a particular retail store while there was sufficient to establish standing to seek injunctive relief against that retailer); Tandy, 380 F.3d at 1284-87 (concluding that an intent "to test Wichita Transit's fixed-route services several times pers per year" was sufficient to demonstrate that they were "under a real and immediate threat" of experiencing a lift malfunction). Plaintiffs therefore

have standing to assert their claims here, including the request for an injunction as to future conduct.

Defendants also rely on Eleventh Amendment sovereign immunity with respect to plaintiffs' challenge to the curtains closing before executions are complete.  They assert the exception to that immunity set out in <u>Ex Parte Young</u>, 209 U.S. 123 (1908), is not applicable here because there is no demonstrated threat of an ongoing violation and because the relief sought by plaintiffs is really based on the Lockett execution and hence retrospective, rather than prospective, in nature.  Defendants' arguments are unpersuasive.  The DOC policy which plaintiffs challenge is now in effect and will remain effective until modified, which means it will govern the upcoming executions and is intended to do so.  As such, there is a "threat of an ongoing violation."  Similarly, it is clear that plaintiffs seek to do more here than just recover for any injuries to them associated with the Lockett execution—they seek to address prospectively the application of the new policy to future executions.  *See* <u>Buchwald</u>, 159 F.3d at 495, n. 5 ("The existence of a past harm does not convert a prospective injunction into retrospective relief barred under the Eleventh Amendment.").  The relief sought here is within the scope of <u>Ex Parte Young</u> and plaintiffs' claims are not barred by Eleventh Amendment immunity.

### Motion for Preliminary Injunction

Plaintiffs seek to enjoin defendants from enforcing the new execution protocol insofar as it reduces the number of press representatives and permits the withdrawal of any visual or auditory access during the execution proceeding.  They also seek an order requiring

defendants to permit full audio and visual access to the entire execution process, from the time the inmate to be executed enters the execution chamber until after he has been declared dead, specifically including the process of having the IVs inserted.

To warrant the issuance of a preliminary injunction, a movant must show that (1) irreparable injury will occur if the motion is denied; (2) movant's threatened injury outweighs the harm that the opposing party would suffer if the injunction is granted; (3) the injunction is not adverse to the interests of the public; and (4) there is a substantial likelihood movants will prevail on the merits.  Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).  Though part of the relief plaintiffs seek would arguably preserve the status quo, such as preventing a reduction in the number of media witnesses, at least part of the relief sought is plainly mandatory in nature.  Plaintiffs seek an order mandating that the government allow press observation of preparatory measures, including insertion of the IV's, which is a change from the current and historical practice.  Since mandatory relief is sought, plaintiffs "must satisfy a heightened burden" that requires "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms...."  O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004). The more flexible "modified likelihood of success" standard does not apply.  Id.

The likelihood of success element is addressed first, as the court concludes it is determinative of both motions.

Plaintiffs allege that the challenged DOC policies violate their First Amendment right of access to information regarding government proceedings.  The First Amendment's

protection of freedom of the press has traditionally focused on the right of the press to publish information without government restraint, and on the public's correlative right to receive it,[7] rather than on the acquisition of the information in the first place. *See* <u>Zemel v. Rusk</u>, 381 U.S. 1, 16-17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."). However, the process of gathering news or information "is not without its First Amendment protections," <u>Branzburg v. Hayes</u>, 408 U.S. 665, 684, 707 (1972). The First Amendment affords some protection to the process of accessing information but, as a general proposition, does not afford the press a special right of access not available to the public generally. *Id.* at 684; *see also* <u>Houchins v. KQED, Inc.</u>, 438 U.S. 1, 15-16 (1978) (plurality opinion). In particular, in the context of acquiring information about prisons and prison operations, the Supreme Court has stated that "the Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally." <u>Pell v. Procunier</u>, 417 U.S. 817, 834 (1974).

The Supreme Court has recognized an exception to this general rule in the context of criminal proceedings. In <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 580 (1980), it concluded the First Amendment implicitly includes a right of access to criminal trials. Drawing on the "unbroken, uncontradicted history" of public access to criminal trials, the

---

[7]*Although the First Amendment's language literally binds the Congress, it is applicable to the states by reason of the Fourteenth Amendment.* <u>Awad v. Ziriax</u>*, 670 F.3d 1111, 1126 (10th Cir. 2012).*

Court concluded  that a "presumption of openness inheres in the very nature of a criminal trial under our system of justice" and that the right of the public, including the press, to attend criminal trials is guaranteed by the First Amendment.  *Id.*  at 573, 580.  The Court has since extended this principle to other aspects of the criminal adjudication process.  Press-Enter. Co. v. Superior Court, 464 U.S. 501, 510-11 (1984) ("Press-Enterprise I") (*voir dire* examinations); Press-Enter. Co. v. Superior Court, 478 U.S. 1, 8-9 (1986) ("Press-Enterprise II") (preliminary hearings).[8]

In these cases, the Court developed a two part test, involving "complimentary" factors, to determine whether a First Amendment right of public access exists: (1) an "experience" element, which considers whether the public has historically been granted access to the place or process, and (2) the "logic" element, which considers whether access enhances the functioning of the particular process in question.  Press-Enterprise II, 478 U.S. at 8-9.  If both elements are present, a qualified right of public access attaches to the process or proceeding.  *Id.*  at 9.  This qualified right can be overcome by a showing that closure of the particular proceeding is "essential to preserve higher values and is narrowly tailored to serve that interest."  Press-Enterprise I, 464 U.S. at 510.  Based on these principles, plaintiffs argue that they enjoy a qualified right of access to view the entirety of executions and that no state interest outweighs that right.

For multiple reasons, and notwithstanding the undoubted importance to the public of

---

[8]*This exception is referred to in this order as the "Press-Enterprise exception."*

9

information regarding the matters involved here, the court concludes plaintiffs are unlikely to prevail on their First Amendment claim to the extent it is premised on a "qualified right of access" under these cases.  Indeed, based on the authorities discussed below, it cannot prevail on that theory.

First, there is considerable doubt that the Press-Enterprise exception even potentially applies to the circumstances present here. To date, the Supreme Court has not applied the exception outside the criminal adjudication process. The Court's most recent opinion, which extended the exception to preliminary hearings, defines the scope of this exception as "criminal proceedings." *See* Press-Enterprise II, 478 U.S. at 8.  In that opinion, the Court also implied that it does not apply beyond the entry of judgment. *Id.* at 12 (recognizing that, due to their impact on plea agreements, preliminary hearings are often the "final step" in criminal proceedings).  This strongly suggests that the Court views the Press Enterprise exception as applying to the criminal adjudication process rather than to the process of implementing a court's judgment, such as is involved here.

That conclusion is consistent with the Court's different treatment of access issues in the prison context, where the implementation of criminal sentences normally occurs.  Unlike the tradition of openness which exists as to criminal trials, the Court has emphasized the closed nature of prisons. *See* Richmond Newspapers, 448 U.S. at 577 n. 11.  Recognizing that difference, the Court has upheld limits on access to penal institutions even where serious issues as to inmate welfare have existed. *See* Houchins, 438 U.S. at 3, 15 (plurality opinion) (upholding a denial of press access to investigate conditions of a county jail in the wake of

10

a prisoner's suicide).  This suggests the Court would not take principles directed to the process of determining guilt and superimpose them in a different context—the implementation of the sentence.

The Tenth Circuit's treatment of the <u>Press-Enterprise</u> exception is consistent with this limited view of its reach.  That court has not addressed the exception in the context of executions, but has in other contexts.  In <u>Smith v. Plati</u>, 258 F.3d 1167 (10th Cir. 2001), the court dealt with an internet website operator's claim that he had a First Amendment right to acquire information from a state university about its athletic programs.  In rejecting this claim, the court discussed the <u>Press-Enterprise</u> exception and stated: "Because [plaintiff's] claims do not involve a claim of denied coverage of a criminal trial in particular, or any trial proceeding in general, we do not find these cases particularly relevant."  *Id,* at 1178, n. 10. Other cases also suggest the Tenth Circuit views the <u>Press-Enterprise</u> exception as extending only to the circumstances recognized by the Supreme Court.  *See e.g.,* <u>United States v. McVeigh</u>, 119 F.3d 806, 812 (10th Cir. 1997) (declining to decide whether the First Amendment grants a right to access judicial documents because, even if it did apply, the test would not be satisfied); <u>United States v. McVeigh</u>, 106 F.3d 325, 336 (10th Cir. 1997) ("pertinent constitutional proscriptions are implicated only when, through orders closing proceedings, sealing documents, gagging participants and/or restricting press coverage, a <u>trial court</u> has deprived the public at large direct or indirect access to the <u>trial process</u>") (emphasis added); <u>Journal Pub. Co. v. Mechem</u>, 801 F.2d 1233, 1236-37 (10th Cir. 1986) (applying a similar level of scrutiny, but not the  <u>Press-Enterprise</u> test itself, to certain aspects of civil

trials). While other courts have applied the Press-Enterprise exception more broadly,[9] the Tenth Circuit has not.

In any event, based on these authorities, the court concludes the Press-Enterprise exception does not extend to the circumstances existing here, which are outside the criminal adjudication process.

While a conclusion that the Press-Enterprise "qualified right of access" exception does not apply essentially ends the discussion as to that issue, the court concludes it is appropriate, in the absence of explicit binding authority, to consider whether plaintiffs have made out a basis for application of the standard even if it potentially applied. The court concludes they have not. Essential to that conclusion would be a determination that the "experience" element had been satisfied—whether the public has historically been granted access to the place or process—and a basis for that determination has not been established here.

To be sure, there is historical evidence to suggest that public access to executions has existed at some times in the past. *See generally*, Cal. First Amend. Coal. v. Woodford, 299 F.3d at 875-76. Whether that access was so broad as to be comparable to the scope of access sought by plaintiffs here–embracing the preparations leading up the actual execution and the like–is less clear, but there have certainly been instances of relatively broad public access to

---

[9]*Some courts have applied the exception in circumstances far removed from criminal trials or the criminal process. See, e.g., Leigh v. Salazar, 677 F.3d 892 (9th Cir. 2012) (concluding the exception potentially applied to a wild horse roundup conducted by the Bureau of Land Management. At least three courts have applied the exception in the context of challenges to lethal executions. See Cal. First Amend. Coal. v. Woodford, 299 F.3d 868 (9th Cir. 2002); Philadelphia Inquirer v. Whetzel, 906 F.Supp. 2d 362 (M.D. Pa. 2012); Arkansas Times, Inc. v. Norris, 2008 WL 110853 (E.D. Ark. Jan. 7, 2008)(assuming, but not deciding, that the exception applied).*

executions.  At the same time, it is also quite clear that the historical practice is not the same "unbroken, uncontradicted history" of access that the Supreme Court found persuasive in Richmond and its progeny.

Another Supreme Court case makes the point.  In Holden v. Minnesota,137 U.S. 483 (1890), the Supreme Court upheld, as against an *ex post facto* challenge, a Minnesota statute which required executions to be conducted before sunrise, in a jail or private enclosure out of public view, with a limited number of persons present, and which entirely excluded reporters from watching it.  The Supreme Court had no concern with these restrictions, noting they were "regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions...." *Id.* at 491.  As noted above, the question before the court involved an *ex post facto* challenge to the statute rather than a First Amendment challenge and, as plaintiffs argued at the hearing, it clearly pre-dates much of the First Amendment law that now governs this case.  But what it at least does is illustrate that there have been historical practices and traditions in the United States that have not allowed public access to executions.

To the extent that the Oklahoma experience in particular is instructive,[10] the court's conclusion is the same.  Unlike a trial, Oklahoma appears never to have viewed executions as something that anyone could attend.  The earliest post-statehood treatment of the issue,

---

[10]*The "experience" test of the* Press-Enterprise *exception looks to historical practices throughout the United States, rather than to those of any particular jurisdiction.* El Vocero De Puerto Rico v. Puerto Rico, *508 U.S. 147, 150 (1993).  However, courts have routinely considered the traditions of the state in which the dispute arises. See* Cal. First Amend. Coal., *299 F.3d at 871, 876;* Arkansas Times, Inc., *2008 WL 110853, at \*1, \*4.*

Section 2279 of the Criminal Procedure Code of 1908, required that executions take place

"within the walls or yards of a jail ... or some convenient private place in the county." [Doc.

#14-2].   That practice appears to have been consistent with the practice prior to statehood.

Plaintiffs' submissions reference an 1895 newspaper article headlining what it termed the

"First Legal Hanging in Oklahoma."   After noting that the weather was dreary, and thus a

proper day for a hanging, the article stated in part:

> Notwithstanding the weather, however, great crowds gathered at the jail and
> with morbid curiosity viewed the scaffold and peeked [copy is garbled and
> unclear] windows in [hope] of catching a [glimpse of] the condemned man, or
> of someone who had anything to do with the hanging.  Sheriff DeFord, and
> everyone who it was thought had any influence on him, was buttonholed on
> every corner, in the pressure to obtain admittance to the yard.  The sheriff was
> firm, however, and endeavored to fulfill the law in every particular, refusing
> the coveted privilege to some of his best friends.

The story goes on to say:

> In the meantime, the arrangements were being perfected at the scaffold,
> canvass being stretched from the top of the scaffold to the yard fence, shutting
> out the view from the outside and the surrounding buildings.  The cord by
> which the trap was sprung ran into a booth adjoining the gallows, and was so
> arranged that the executioner could not be seen from the audience.

[Doc. #45, Exhibit B].  Though some of plaintiffs' other submissions paint a less restrictive

picture of attendance at executions,[11] it nonetheless seems clear that in Oklahoma the general

public, like Sheriff DeFord's best friends, did not enjoy a general right to view executions.

---

[11]*They also suggest media commentary was a bit more free-wheeling in those days.  A newspaper account of a 1936 execution began with this description: "Laughing and joking with the usual contingent of sob sisters that come to death row when a doomed man prepares to meet eternity, [the man being executed] showed no sign of breaking as the scheduled hour of his death drew near."  [Doc. #45, Exhibit E].*

Consistent with a tradition of private executions, Oklahoma has, since 1915, conducted its executions inside a prison, the Oklahoma State Penitentiary, rather than in a more public venue such as a public square.   [Doc. #45, p.  11].  This practice has been explicitly mandated by statute since at least 1951.  1951 Okla.  Sess.  Law Ch.  17 § 1 [Doc. #14-3].   That same year, the press was, for the first time, authorized by statute to attend executions.  *Id.*

Plaintiffs have suggested that Oklahoma law has previously permitted the presence of the public at executions by reason of the sheriff's authorization to select "twelve reputable citizens" as observers.  *See* Section 2279 of the Criminal Procedure Code of 1908 [Doc. #14-2].  Some courts have concluded that such witnesses act as proxies for the general public and that public access should therefore be deemed present.  *See* <u>Cal. First Amend. Coal.</u>, 299 F.3d at 876.  While that perspective has some surface appeal, it appears to be inconsistent with the Supreme Court's analysis in <u>Richmond Newspaper</u>.  There, the Court traced the history of public access to the criminal jury trial, noting that at some point the "town meeting" approach to trials was supplanted by a twelve-person jury functioning as the public's representatives in the process.   But the court further noted that, despite that shift, "the community did not surrender its right to observe the conduct of trials."  448 U.S. at 572.  So while the practice of allowing twelve reputable citizens to attend an execution has superficial similarity to the "representative" function of a twelve person jury, the situations are not parallel.  *See* <u>Arkansas Times</u>, 2008 WL 110853 at *4 ("However, the presence of six to twelve citizen witnesses does not transform a private execution into a public proceeding

15

comparable to a criminal trial."). Members of the general public—not just designated representatives–retained a right to attend criminal trials. No comparable right exists–or has existed–in Oklahoma as to executions. In any event, the court concludes that plaintiffs have not established the sort of historical tradition of openness as would satisfy the "experience" element of the <u>Press Enterprise</u> test, even if it was otherwise applicable.

Plaintiffs argue that the logic of allowing the press to observe the entirety of executions is so compelling that the court should find a right exists even if the "experience" element is lacking. Some courts have taken such an approach.[12] To be sure, there are significant policy considerations present here—the need for public information about governmental processes generally and the need for public confidence in the manner in which the death penalty is applied, among others—which would counsel in favor of some sort of broad public or press access such as plaintiffs seek. But finding a constitutional right of access based solely on such considerations is inappropriate for at least two reasons. First and foremost, that approach does not square with the standard set by the Supreme Court, which requires a showing as to both "experience" <u>and</u> "logic." Second, interpreting the First Amendment in that manner—based solely on the "logic" of the parties' policy argument or on the court's assessment of the interests involved, and untethered to a historical tradition or some other identifiable standard—would largely abandon the appropriate limits on the

---

[12]*See* <u>Detroit Free Press v. Ashcroft</u>, *303 F.3d 681, 701 (6th Cir. 2002)("Therefore, although historical context is important, a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted.").*

judicial function and put the court in the position of making legislative policy choices.  *See* Houchins, 438 U.S. at 9, 12-14 (plurality opinion) ("The public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a right of the public or the media to enter these institutions" because the access sought by plaintiffs there was "clearly a legislative choice").  Proceeding on the basis of some generalized right of access in these circumstances would be tantamount to turning the First Amendment into a sort of court-ordered freedom of information act, a result inconsistent with Supreme Court precedent.  McBurney v. Young, 133 S.Ct. 1709, 1718 (2013) ("This court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws.").[13]

For the reasons stated, the court concludes the Press-Enterprise exception is not applicable here.

Plaintiffs offer a second potential exception to the general rule that the government need not provide access to information within its control.  Citing Lanphere & Urbaniak v. Colorado, 21 F.3d 1508 (10th Cir. 1994), they suggest that even if the government is not required to provide access to executions, once it does so it cannot thereafter limit that access "on unlawful grounds." [Doc. #24, p. 18].  Specifically, they argue that because Oklahoma has given the press access to executions in the past, it cannot now "provide access only to

---

[13]*See also Los Angeles Police Dept. v. United Reporting Pub. Corp., 528 U.S. 32, 40 (1999)* *("what we have before us is nothing more than a governmental denial of access to information in its possession.  California could decide not to give out arrestee information at all without violating the First Amendment.").*

portions of the proceeding that show no improper government activity." *Id.* (emphasis in original).

In <u>Lanphere</u>, the Tenth Circuit reviewed a Colorado statute that restricted public access to criminal justice records containing personal information, but which applied the restriction only to information intended to be used for commercial purposes.  21 F.3d at 1510.  After rejecting application of the <u>Press-Enterprise</u> line of cases (on the basis that doing so would "stretch them well beyond their current bounds"), the court concluded that First Amendment scrutiny was nonetheless appropriate.  *Id.* at 1512.  Because the statute drew lines based on the intended commercial use of the information sought, the court concluded that it constituted a "content-based restriction on protected speech," which triggered First Amendment scrutiny.  *Id.* at 1513.  The court ultimately rejected the challenge to the Colorado statute, but did so applying the analysis applicable to a content-based limitation on use of the information.[14]

The DOC policies at issue here do not involve the sort of content-based restrictions to which the <u>Lanphere</u> and similar cases were directed.   The policies do not restrict access to the execution proceeding based on the viewpoint of the press organization involved,[15] or based on the use to which the particular press organization seeks to put the information.

---

[14]*The court relied on various Supreme Court decisions applying First Amendment scrutiny to content-based regulations or limitations, e.g.,* <u>City of Cincinnati v. Discovery Network, Inc.</u>, *507 U.S. 410 (1993) and* <u>Arkansas Writers Project, Inc. v. Ragland</u>, *481 U.S. 221 (1987).*

[15]*As noted above, the selection of particular press/media witnesses is based on a lottery arrangement and there is nothing in the present submissions to suggest the lottery operates in other than a random way.*

They do prevent media access to some portions of the process, while permitting access to others, but that does not, in and of itself, violate First Amendment principles. Adoption of plaintiffs' approach—that any limitation is potentially unconstitutional which might shield "improper government activity"—is inconsistent with the law's recognition that the constitution does not mandate public access to all information. Any government activity might conceivably be conducted negligently or poorly, and hence be "improper" under plaintiffs' characterization. Given that possibility, plaintiffs' standard would effectively present governmental units considering public access to government processes or information with an "all or nothing" choice—either give access to everything or give no access at all—which could have the perverse effect of encouraging less public disclosure rather than more. In any event, the court concludes the DOC policies at issue here do not constitute content-based restrictions such as would trigger First Amendment scrutiny under the Lanphere rationale.[16]

Having concluded plaintiffs' claims cannot be grounded on either the qualified right of access recognized in the Press-Enterprise line of cases or on the First Amendment limitations referenced in Lanphere, what then remains? What standard is applicable in testing the limitations on press access at issue here?

Without much discussion, the parties appear to assume that if the Press-Enterprise or

---

[16]*See also, Los Angeles Police Dept., 528 U.S. at 43 (Ginsburg, J., concurring), noting that once a state decides to make information available there are limits on its ability to limit that information. However, the concurrence references limitations based on viewpoint discrimination, political affiliation, or similar grounds as potential improper grounds for limitation. No such grounds are suggested here.*

Lanphere exceptions do not apply, then the more deferential standard of Turner v. Safley, 482 U.S. 78 (1987), does.  In Turner, the Court concluded that a prison regulation "is valid if it is reasonably related to legitimate penological interests."  Id. at 89.  The court proceeded to identify several factors that are relevant to this determination.[17]

The Turner standard is directed to balancing constitutional rights against the government's interest in operating prisons.  See Washington v. Harper, 494 U.S. 210, 224 (1990)("Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights")(emphasis added).   Ordinarily, the balancing is done in connection with those constitutional rights retained by the incarcerated inmate.  However, Turner balancing has also been used as to "outsiders", i.e., non-inmates, when they have constitutional rights impacted by a prison regulation.  For example, in Overton v. Bazzetta, 539 U.S. 126 (2003), the plaintiffs included inmates' family members who had associational rights separate and apart from the inmates.  Similarly, in Thornburgh v. Abbott, 490 U.S. 401 (1989), the plaintiffs included  publishers whose First Amendment rights to publish and communicate with others were implicated.   In these cases, the non-inmate plaintiffs had constitutional rights of their own which were impacted by the particular prison regulations or restrictions being challenged.  So the threshold question here is whether plaintiffs, as members of the press, have constitutional rights of access to which the Turner balancing

_____

[17]The factors are (1) whether a "valid, rational connection" exists between the regulation and the penological interests; (2) whether alternative means of exercising the claimed right are available; (3) the impact accommodation of the claimed right would have on guards, inmates, and resources; and (4) whether alternative means of achieving the government's interests exist.  482 U.S. at 89-91.

process may be directed.

The Supreme Court has concluded that the rights of the press to information about prison operations or functions are no more extensive than those of the general public:

> Similarly, newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public.
>
> The First and Fourteenth Amendments bar government from interfering in any way with a free press.  The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally.

Pell, 417 U.S. at 834 (emphasis added).  So if the press' right of access is co-extensive with that of the general public, the question then becomes whether the general public has a constitutional right of access to the type of information that plaintiffs seek here.

The answer appears to be no.   Plaintiffs have not identified any constitutional basis for a general right of public access to government information.   As the Tenth Circuit observed in Smith v. Plati, 258 F.3d at 1178:

> It is well-settled that there is no general First Amendment right of access to all sources of information within government control.  See Houchins v. KQED, Inc., [citation omitted]; see also id at 15 ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."); Lanphere & Urbaniak v. Colorado [citation omitted] ("There is no constitutional right, and specifically no First Amendment right, of access to government records."). This applies with equal force to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the pubic.  (Emphasis added.)

Given this relationship between the rights of the press and the public (and assuming, as discussed above, that the Press-Enterprise exception is not applicable), the result is that there

21

is no constitutional right of access to this sort of proceeding which inheres in the press/public and hence no competing rights to which a Turner balancing might be applied.

Given this conclusion, it is unnecessary to make any in-depth analysis of how the Turner balancing process might operate here if it was otherwise applicable. Suffice it to say that the interests defendants indicate they seek to protect with the challenged protocol—carrying out the ordered execution, securing qualified personnel, ensuring staff safety, and the like—are generally legitimate ones. The disputed procedures would be evaluated against the backdrop of the deference given to prison officials where legitimate penological interests are involved. *See* Turner, 482 U.S. at 90 (quoting Pell, 417 U.S. at 827) ("courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation'"). Further, the evaluation would take into account that defendants do not seek to bar press access to executions altogether, but only limit it as set forth in the protocol. In these circumstances, it is less than obvious that plaintiffs would prevail based on a Turner balancing, even if one was appropriate.

In light of the above, the court concludes that plaintiffs' First Amendment claims necessarily fail and that, as a result, they cannot show the "likelihood of success" necessary for the issuance of a preliminary injunction. The request for preliminary injunction will therefore be denied.

## Motion to Dismiss

In the circumstances of this case, the court's conclusions as to the legal underpinnings

of plaintiffs' claims do more than warrant the denial of a preliminary injunction. They also result in the dismissal of the underlying First Amendment claims. Ordinarily, a motion to dismiss is evaluated based on whether sufficient factual assertions are included in the complaint to state a claim.[18] Here, however, defendants' challenge to the complaint is not a matter of the sufficiency of the factual allegations but whether, even assuming its arguably conclusory allegations to be true, a claim is stated as a matter of law. The court's conclusions as to the scope of the Press-Enterprise exception and as to the absence of a public/press legal right of access in these circumstances are based on the state of the law, not on the adequacy of plaintiffs' factual allegations.[19] As a result, most and perhaps all of the deficiencies in plaintiffs' complaint are not ones which can be remedied by amendment.[20] However, as the parties have not had a meaningful opportunity to address whether, in light of this order and the applicable law, amendment is appropriate, the court concludes it would be premature to dismiss this case with prejudice at this juncture. Plaintiffs will be granted leave to amend their complaint to attempt to state a claim, if they can do so.

---

[18]*When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the nonmoving party. Anderson v. Suiters, 499 F.3d 1228, 1232 (10th Cir. 2007). The question is whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The complaint must provide sufficient factual allegations to "raise a right to relief above the speculative level." Id. at 555.*

[19]*Questions as to the history and tradition involved with the "experience" portion of the Press Enterprise exception are not wholly legal questions, but conclusions as to the scope of the exemption are.*

[20]*It is theoretically possible that a claim based on the Lanphere line of cases might be stated if appropriate facts were present.*

Oklahoma State Claim

As noted at the outset of this order, plaintiffs also assert a claim based on Art. 2, § 22 of the Oklahoma Constitution.[21]  As briefly referenced at the hearing, it is unclear whether Oklahoma would interpret its constitution differently from the First Amendment principles discussed above.  Conceivably, it could do so.  *See* Florida v. Powell, 559 U.S. 50, 56 (2010) (quoting Minnesota v. National Tea Co., 309 U.S. 551, 557 (1940): "It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."); *see also,* United States v. DeGasso, 369 F.3d 1139, 1145 (10th Cir. 2004) ("It is axiomatic that state courts are the final arbiters of state law.").  Because any issues in this regard are ones of state law best left to the state courts in the first instance, the court anticipates, if plaintiffs elect not to amend or if the case is otherwise dismissed at an early juncture, declining to exercise supplemental jurisdiction over the claim based on the Oklahoma Constitution.  28 U.S.C. § 1367(a).

Conclusion

A concluding word is in order.  The only question raised by this case and addressed by this order is whether Oklahoma's execution protocols violate the First Amendment to the U.S. Constitution—whether there is a constitutional right to broader press access than the protocol contemplates.  A conclusion that the protocol does not violate the Constitution does

---

[21] *"Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."*  OKLA. CONST. art 2, § 22.

not  necessarily mean it is good policy or that it is the best approach in the circumstances. *See*  Houchins, 438 U.S. at 13 ("We must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment. To do so is to trivialize constitutional adjudication.").

As plaintiff's submissions indicate, Oklahoma has, in recent years, embraced both open records and open meetings. [Doc. #45, pp.  5-7].  Plaintiffs make a compelling argument that, given the nature of the interests involved and in light of Oklahoma's experience with the Lockett execution, a more open and expansive policy of access and disclosure may be desirable.  But in the circumstances of this case, the question of the appropriate policy is just that–a policy judgment.  It is therefore a matter for Oklahoma's decision-makers, rather than one for resolution by this court.

For the reasons stated, plaintiffs' motion for preliminary injunction [Doc. #23] is **DENIED** and defendant's motion to dismiss [Doc. #32] is **GRANTED**.[22]  Plaintiffs' claims arising under the First Amendment are **DISMISSED**.  Plaintiffs are granted leave to file an amended complaint within **fourteen (14) days**, if they elect to do so.

**IT IS SO ORDERED**.

Dated this 19th day of December, 2014.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[22]*Defendants' earlier motion to dismiss [Doc. #14] went to an earlier version of the complaint and is therefore **STRICKEN**.  Plaintiff's motion for hearing was substantially granted by the court's earlier order for hearing.  That motion [Doc. #31] is now **GRANTED** of record.*